# ATTACHMENT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| VISTO CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.: 2:03-CV-333-TJW |
| v. | ) | |
| | ) | Before:  Hon. T. John Ward |
| SEVEN NETWORKS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## SEVEN NETWORKS, INC.'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ON NONINFRINGEMENT AND INVALIDITY OR, IN THE ALTERNATIVE, FOR A NEW TRIAL

## <u>TABLE OF CONTENTS</u>

Page

I.    INTRODUCTION ...............................................................................................1

II.   LEGAL STANDARD.........................................................................................1

     A.    Motion For Judgment As A Matter Of Law ...........................................1

     B.    Motion For A New Trial ........................................................................1

III.   ARGUMENT .....................................................................................................2

     A.    Seven Is Entitled To A Judgment Of Noninfringement As A Matter Of Law Because There Is No Evidence That The Accused Products Satisfy The "Independently Modifiable Copy" Limitation Present In All Asserted Claims ....................................................................................................4

     B.    Seven Is Entitled To A Judgment Of Noninfringement As A Matter Of Law As To Claims 5 And 24 Of The '708 Patent, And Claims 11 And 22 Of The '192 Patent, Because The Undisputed Evidence Establishes That The Accused Products Do Not Satisfy The Limitations Requiring A Second "Workspace Element" .......................................................................9

     C.    Seven Is Entitled To A Judgment Of Noninfringement As A Matter Of Law As To Claim 8 Of The '221 Patent, Because The Undisputed Evidence Establishes That The Accused Products Do Not Satisfy The "Global "Server" Limitation .....................................................................11

     D.    Seven Is Entitled To A Judgment Of Noninfringement As A Matter Of Law As To Claim 11 Of The '192 Patent, Because The Undisputed Evidence Establishes That The Accused Products Do Not Satisfy The "Comprising One Of An HTTP Port And An SSL Port" Limitation ...................13

     E.    Seven Is Also Entitled To A Judgment Of Noninfringement As A Matter Of Law, Because Visto Failed To Establish That The Accused Products Satisfy The Synchronization Described In Claim 11 Of The '192 Patent ............17

     F.    Seven Is Also Entitled To A Judgment Of Noninfringement As A Matter Of Law, Because Visto Failed To Establish That The Accused Products Satisfy The Synchronization Elements Required By The '708 Patent .................18

     G.    Seven Is Also Entitled To A Judgment As A Matter Of Law Of Noninfringement, Given A Proper Construction Of The Claim Elements ............19

     H.    Seven Is Also Entitled To A New Trial Under Rule 59(A) Because The Adverse Opinion Of Counsel Inference Prevented Seven From Receiving A Fair Trial ..............................................................................................19

          1.    Seven Did Not "Open The Door" And Waive Its Attorney-Client And Work Product Privileges ...................................................21

2.  The Federal Circuit's Decision In *Knorr-Bremse* Prohibits The Adverse Inference Raised By Visto ....................................................................22

3.  Seven Was Further Prejudiced Because The Court Denied Seven's Request To Defend Itself From The Impermissible Adverse Inference ...............................................................................................23

4.  Seven Is Also Entitled To JMOL Because The Questions And Argument Regarding Seven's Opinions Of Counsel Should Have Been Excluded Under Federal Rules Of Evidence 402 And 403 ............24

I.  Seven Is Entitled To A New Trial Regarding Its '192 Invalidity Claim ..............25

1.  A New Trial Is Warranted Because The Court Denied Discovery On The Newly Issued '192 Patent Claims ...................................................25

2.  A New Trial Is Warranted Because The Court Erroneously Struck Seven's Expert Reports And Disallowed Evidence Regarding The Newly-Issued '192 Patent Claims..............................................................27

J.  Judgment As A Matter Of Law Is Appropriate Because There Is No Evidence Supporting A 19.75 Percent Royalty Rate .............................................28

K.  Seven Is Entitled To Judgment As A Matter Of Law As To Invalidity Of The '708 Patent ......................................................................................................29

L.  Seven Is Entitled To Judgment As A Matter Of Law As To Invalidity Of The '221 Patent ......................................................................................................31

M.  Seven Is Entitled To Judgment As A Matter Of Law As To Invalidity Of The '192 Patent, Because The Use Of A Modem And Headset With Lotus Notes Constitutes A "Smartphone" ......................................................................32

N.  Seven Is Entitled To Judgment As A Matter Of Law As To All Patents And Claims Not Asserted At Trial.......................................................................32

IV.  CONCLUSION.............................................................................................................33

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

### <u>Cases</u>

*ACTV, Inc. v. Walt Disney Co.*,
    346 F.3d 1082 (Fed. Cir. 2003) .............................................................. 11

*Applied Medical Resources Corp. v. United States Surgical Corp.*,
    147 F.3d 1374 (Fed. Cir. 1998) ................................................. 1, 19, 31, 32

*Bogosian v. Mercedes Benz of North America*,
    104 F.3d 472 (1st Cir. 1997) ..................................................................... 2

*Brown-Bey v. United States*,
    720 F.2d 467 (7th Cir. 1983) .................................................................. 26

*Bruff v. North Mississippi Health Services, Inc.*,
    244 F.3d 495 (5th Cir. 2001) ............................................................... 1, 33

*Carr v. Wal-Mart Stores, Inc.*,
    312 F.3d 667 (5th Cir. 2002) ..................................................................... 2

*Hanson v. Alpine Valley Ski Area, Inc.*,
    718 F.2d 1075 (Fed. Cir. 1983) .............................................................. 28

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*,
    383 F.3d 1337 (Fed. Cir. 2004) ..................................................... 20, 22, 24

*Los Angeles News Service v. CBS Broadcasting, Inc.*,
    305 F.3d 924 (9th Cir. 2002), *amended at Los Angeles News Service v.
    CBS Broadcasting, Inc.*, 313 F.3d 1093 (9th Cir. 2002) ........................... 28

*Lucas Aerospace Ltd. v. Unison Industries, LP*,
    890 F. Supp. 329 (D. Del. 1995) .............................................................. 10

*McKesson Information Solutions, Inc. v. Bridge Medical, Inc.*,
    WL 1030170, Slip Copy (E.D. Cal. 2006) ............................................ 20, 23

*National Presto Industries, Inc. v. West Bend Co.*,
    76 F.3d 1185 (Fed. Cir. 1996) ................................................................... 1

*Pan-Islamic Trade Corp. v. Exxon Corp.*,
    632 F.2d 539 (5th Cir. 1980), *cert. denied*, 454 U.S. 927 (1981),
    *abrogated on other grounds*, *Todorov v. DCH Healthcare Authority*,
    921 F.2d 1438 (11th Cir. 1991) ............................................................... 27

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ................................................ 11

*Rosario v. Livaditis*,
    963 F.2d 1013 (7th Cir. 1992), *cert. denied*, 113 S. Ct. 972 (1993) ........... 26

*Santa Maria v. Metro-North Commuter R.R.*,
  81 F.3d 265 (2nd Cir. 1996) ............................................................................ 2

*Smith v. Transworld Drilling Co.*,
  773 F.2d 610 (5th Cir. 1985) ............................................................................ 2

*SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*,
  926 F.2d 1161 (Fed. Cir. 1991) ..................................................................... 28

*Standard Havens Prods. v. Gencor Indus., Inc.*,
  953 F.2d 1360 (Fed. Cir. 1991), *cert. denied*, 113 S. Ct. 60 (1992) ............ 28, 29

*Studiengesellschaft Kohle, m.b.H. v. Dart Industries, Inc.*,
  862 F.2d 1564 (Fed. Cir. 1988) ..................................................................... 22

*Texas Instruments, Inc. v. United States Internationl Trade Commission*,
  988 F.2d 1165 (Fed. Cir. 1993) ..................................................................... 10

*Unisplay, S.A. v. American Electric Sign Co.*,
  69 F.3d 512 (Fed. Cir. 1995) ....................................................................... 28, 29

*United States v. An Article of Drug Consisting of 4,680 Pails, More or Less, Each*,
  725 F.2d 976 (5th Cir. 1984) ........................................................................... 1

*Vitronics Corp. v. Conceptronic, Inc.*,
  90 F.3d 1576 (Fed. Cir. 1996) ...................................................................... 11

*Williamson v. United States Dept. of Agriculture*,
  815 F.2d 368 (5th Cir. 1987) ......................................................................... 27

## Statutes

35 U.S.C. § 284 ............................................................................................... 28

## Rules

Federal Rule of Civil Procedure 50(a)(1) ...................................................... 1, 31

Federal Rule of Civil Procedure 50(b) ............................................................... 1

Federal Rule of Civil Procedure 59(a) ................................................. 1, 19, 25, 33

Federal Rule of Evidence 402 ..................................................................... 24, 25

Federal Rule of Evidence 403 ..................................................................... 24, 25

## I.    INTRODUCTION

Pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, Defendant Seven Networks, Inc. ("Seven") hereby moves post-trial and renews its motion for judgment as a matter of law ("JMOL") that the '708, '221, and '192 patents are not infringed, and are invalid under 35 U.S.C. § 102(b).  In the alternative, Seven moves for a new trial pursuant to Rule 59(a) of the Federal Rules of Civil Procedure.

## II.    LEGAL STANDARD

### A.    Motion For Judgment As A Matter Of Law

Judgment as a matter of law is proper when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." FED. R. CIV. P. 50(a)(1).  In determining whether it should grant judgment as a matter of law, "the Court should consider all of the evidence – not just that evidence which supports the non-mover's case." *Bruff v. N. Mississippi Health Servs., Inc.*, 244 F.3d 495, 499 (5th Cir. 2001).[1]  If no reasonable jury could have reached its verdict in light of the record before the jury, the Court must grant judgment to Seven.  *Applied Med. Resources Corp. v. United States Surgical Corp.*, 147 F.3d 1374, 1376 (Fed. Cir. 1998).

### B.    Motion For A New Trial

Under Rule 59(a) of the Federal Rules of Civil Procedure, a trial judge can grant a new trial if he believes the verdict is contrary to the weight of the evidence.  In a motion for a new trial, the judge is free to weigh the evidence.  *United States v. An Article of Drug Consisting of 4,680 Pails, More or Less, Each*, 725 F.2d 976, 990 (5th Cir. 1984).  Although substantial evidence supporting the verdict may preclude a JMOL, it does not prevent the court from granting a new trial if, in its view, the verdict is against the clear weight of the evidence.  *An*

---

[1]    On procedural matters not unique to the areas that are exclusively assigned to the Federal Circuit, the law of the regional circuit shall be applied.  *See National Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1188 n.2 (Fed. Cir. 1996).  Here, Fifth Circuit law controls.

*Article of Drug*, *supra*; *Bogosian v. Mercedes Benz of N. Am.*, 104 F.3d 472, 482 (1st Cir. 1997); *Santa Maria v. Metro-North Commuter R.R.*, 81 F.3d 265, 273 (2nd Cir. 1996).

Indeed, a trial judge has a duty to set aside a verdict even though it is supported by substantial evidence, if the judge "is of the opinion that the verdict is against the clear weight of the evidence, or is based upon evidence which is false or will result in a miscarriage of justice …" *Carr v. Wal-Mart Stores, Inc.*, 312 F.3d 667, 670 (5th Cir. 2002). The court does not presume that the verdict is correct; nor need it view the evidence in the light most favorable to the party in whose favor the verdict was rendered. *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985).

## III.   ARGUMENT

The patents in this action cover various aspects of a specific type of system designed to permit a user's "workspace elements" to be modified remotely. Workspace elements include e-mails, documents, and calendars, which are stored on a user's corporate local area network (LAN) server. Although the LAN server is protected by a firewall, the workspace elements may be modified from a remote device, such as a laptop computer, personal data assistant (PDA), or smart phone. The patented system utilizes a "global server" located outside of the corporate LAN (and its firewall) and between the LAN and remote device. The global server stores "independently modifiable copies" of the workspace elements that the user wishes to modify remotely. A remote device can then retrieve the independently modifiable copies from the global server and modify the copies. Through the remote devices, the copies on the global server can be modified independently of the copies on the corporate LAN, such that the copies on the LAN and global server may be different for extended periods of time. Periodically, the corporate LAN can initiate a "synchronization" with the global server to once again make the copies of the workspace elements on the corporate LAN identical to the copies on the global server. Because the global server is located outside of the firewall protecting the corporate LAN, the corporate LAN always initiates synchronization so that the LAN can control the timing of the

synchronization and better protect against hackers.  In one of the asserted claims, the communications between the global server and the corporate LAN are disguised as regular internet communications by using both the ports and protocols (specifically, the hypertext transfer protocol (HTTP) and the secured sockets layer (SSL) protocol), typically used for such standard internet communications.  In this embodiment, the corporate IT department does not need to open additional ports or add custom functionality to process uncommon or non-standard protocols.

As explained below, the patent claims asserted against Seven's Enterprise Edition, Server Edition, and Personal Edition software products are not infringed because those products indisputably do not contain each and every element required by the claims.  Specifically, as to all five asserted claims, Seven's product does not contain an "independently modifiable copy."  As to the '192 and '708 patent claims, Seven's product does not use a "second workspace element." As to the '221 claim, Seven's product does not use a "global server" as required by that claim. Further, Seven's product does not use both HTTP and SSL over those ports as required in the '192 patent, and does not meet the synchronization elements of the '708 and '192 patent claims. Judgment as a matter of law as to noninfringement is therefore appropriate.

Additionally, allowing Visto's counsel to argue an adverse inference as to Seven's privileged legal opinion letters – while thereafter prohibiting Seven from introducing the actual contents of those letters – requires a new trial, in that this prejudicial error tainted the entire case. In addition, the patents are invalid because the asserted claims are anticipated by the Lotus Notes software, which predates the patents-in-suit.  As explained below, the Court should enter judgment as a matter of law as to noninfringement and invalidity.  Alternatively, the Court should grant a new trial.

### A. Seven Is Entitled To A Judgment Of Noninfringement As A Matter Of Law Because There Is No Evidence That The Accused Products Satisfy The "Independently Modifiable Copy" Limitation Present In All Asserted Claims

A claim limitation requiring the presence of an "independently modifiable copy" is present in all asserted claims. This limitation is expressly recited in claims 11 and 22 of the '192 patent (DX-1802) and claims 5 and 24 of the '708 patent (DX-1402). Each of these four claims expressly requires an "independently modifiable copy" of a "workspace element."

The independently modifiable copy limitation is indirectly present in the fifth asserted claim, claim 8 of the '221 patent, by virtue of a limitation requiring a "global server" (DX-1405). This is because the Court has defined a "global server" to be "a server accessible from remote locations which stores *independently modifiable copies* of selected portions of workspace data." (Dkt. Entry No. 145 (Court's April 20, 2005 Claim Construction Order) at 23 (emphasis added).)

Because the "independently modifiable copy" limitation is present in all asserted claims, Seven is entitled to a judgment of noninfringement if the accused products do not satisfy that limitation. Visto's expert, Dr. Sabin Head, agreed with this proposition at trial:

> Q. Now, if the jury finds that Visto has not proven that the SEVEN System has an independently modifiable copy that meets this definition, none of the five claims in this case are infringed, are they?
>
> A. That's correct, sir.
>
> Q. If the jury finds that this definition is not met in the SEVEN System, they must find noninfringement of all five claims. You agree, don't you?
>
> A. Yes, sir, I agree.

(*See* Declaration of James C. Pistorino In Support of Seven Networks, Inc.'s Renewed Motion For Judgment As a Matter of Law on Noninfringement, Willful Infringement, and Invalidity Or, In the Alternative, For a New Trial ("Pistorino Decl."), Ex. C at 32:13-22.).

The evidence at trial conclusively established that the accused Seven products do not contain "independently modifiable copies" of either "workspace elements" or "selected portions of workspace data" as required by the claims. The Court construed "independently modifiable copy" to mean "a copy of a workspace element *capable of being modified independent of the workspace element*. The copy of the workspace element does not have to be in the same format

as the workspace element." (Dkt. Entry No. 145 (Court's April 20, 2005 Claim Construction Order) at 17 (emphasis added).) Consequently, to satisfy this limitation, somewhere in the accused products there must be a *copy* of the workspace element that *can be modified* independently of the workspace element stored on the corporate LAN. At trial, Visto adduced no evidence of such an independently modifiable copy.

First, the remote device does not receive an independently modifiable "copy." Visto's expert, Dr. Head, conceded that a "copy" must be an *identical* copy:

> Q. Now, Visto took the position in this case that copy did not have to be an identical copy. That's what you were remembering, isn't it?
>
> A. That's correct.
>
> Q. And that was rejected, wasn't it?
>
> A. That's correct.

(Pistorino Decl. Ex. C at 32:2-7.)

Dr. Head admitted what the smart phone (*i.e.*, remote device) receives is not an independently modifiable copy:

> Q. And what I'm getting at is whether the Smartphone of the SEVEN System actually gets a copy of the file or gets something different, like something like the file, something that looks like the file, okay?
>
> A. Yes, sir.
>
> Q. Are we clear?
>
> A. Yes, sir, we're very clear.
>
> Q. Okay. Now, what the Smartphone gets is not identical to what was sent, is it?
>
> A. It is in the same format as the workspace element?
>
> Q. Can you answer my question?
>
> A. It is -- it is not identical; that is correct, sir.
>
> **Q. So if a copy requires it to be identical, the SEVEN System does not get an independently modifiable copy?**
>
> **A. That is correct, sir.**

(Pistorino Decl. Ex. C at 45:6-23 (emphasis added).)

This testimony makes sense because, while both the corporate LAN and global server store information on *servers*, remote devices have significantly less storage capacity than a server, which Mr. Mendez described as "a powerful computer." (Pistorino Decl. Ex. A at 86:21-25.) Consequently, Seven would not design a system wherein a copy could be stored on remote devices, because such a system would not work with today's remote devices.

During Visto's rebuttal case, Dr. Head attempted to back-track from his earlier testimony by testifying that what is stored in the remote device is equivalent to an identical copy. For example, Dr. Head testified that what gets received by the remote device is, in effect, a "copy" because it contains all of the "essential information":

> Q (by Mr. Stevenson).    Now, let me ask you this question. **Obviously, it's not identical between the original and the copy.  We all know that.  Is it still a copy?**
>
> A.    It is still a copy, sir.
>
> Q.    Why do you say it's still a copy, even though it's not identical?
>
> A.    **Because the essential information is still there**, and many of the fields are not part of what I would call the essential information.

(Pistorino Decl. Ex. G at 17:1-10 (emphasis added).)

Dr. Head further testified that what the remote device receives is equivalent to a "copy" even though it may be truncated, transmitted in multiple installments, or lack attachments because the missing information or attachments can be retrieved with additional requests. (*Id.* at 123:21-124-20.) Thus, Dr. Head is stretching the term "copy" to encompass situations that were neither disclosed in the patents nor within the Court's claim construction. Such testimony by Dr. Head is consequently insufficient to support the jury's verdict. It should also be disregarded entirely because it goes to the issue of whether the non-copies in the accused products are *equivalent* to the claimed "copies," and the Court struck the doctrine of equivalents from this case.

Second, Dr. Head bolstered his admission that the smart phone does not contain "independently modifiable copies" when he conceded that the smart phone does not function as

the "global server" that contains the "independently modifiable copies" required by the Court's construction:

> Q.    Do you contend the Smartphone of the SEVEN System ever functions as a global server?
>
> A.    No, sir.  It is a client, sir.

(Pistorino Decl. Ex. C at 41:9-11.)

Again, Dr. Head's concession makes sense, among other things, because the remote devices are not servers since they lack the powerful computing abilities that characterize servers. In addition, as Seven's expert, Dr. Benjamin Goldberg, explained, a smart phone or other remote device cannot be a "global server" because they are not "accessible from remote locations" as required by the claim construction.  (Dkt. Entry No. 145 (Court's April 20, 2005 Claim Construction Order) at 23; *see also* Pistorino Decl. Ex. D at 88:12-23.)  This testimony was not rebutted and stands unrefuted on the record.

Having conceded that what appears on the smart phone is not a "copy" and that the smart phone cannot be the global server, Visto (through Dr. Head) was forced to assert that transient encrypted copies of workspace elements that appear in RAM (random access memory) in various servers used to route the information between the corporate LAN and the smart phone satisfy the "independently modifiable copy" requirement.  (Pistorino Decl. Ex. G at 131:5-19; 133:24-134:8; 134:23-135:11.)  Thus, Visto misleadingly focused on whether transient, intermediate routing through RAM could satisfy the portion of the Court's definition of "store."  (*See*, *e.g.*, *id.* at 133:1-134:8.).  But this argument deftly avoided the real issue – whether what passes through the transient, intermediate RAM constitutes an "independently modifiable copy."  The truth is that the transient intermediate copies that pass through routing servers are not *independently modifiable* in the Seven products.  In fact, the Seven products neither require nor desire intermediate independently modifiable copies because all that the Seven products do is push e-mails and other workspace elements end-to-end from the corporate LAN to the handset.  In addition, Seven emphasizes that its products provide more security *because of the fact that they*

*do not utilize intermediate accessible copies of a user's information*.  (Pistorino Decl. Ex. D at 86:4-87:7.)   Seven provides additional security by *encrypting the transmissions from the corporate LAN to the remote device*.  Thus, what is temporarily stored in the RAM of the routing servers is encrypted and cannot even be read – much less modified.  But in addition to being non-"modifiable," it is plainly not a "copy" under any definition of that term.  In fact, the encrypted material is *designed* to be unrecognizable to a user even if a user could access it.  Encryption is the mathematical antithesis of making a copy – the purpose of making a copy is to reveal to a user what is on the corporate LAN; the purpose of encryption is to *conceal* what is on the corporate LAN.  As Seven's expert, Dr. Goldberg, explained in unrefuted testimony:

> Q.  So all five [asserted claims] require an independently modifiable copy, right?
>
> A.  Yes.
>
> Q.   Now, you just said that the message was encrypted as it went through the Internet.  Can an encrypted message be an independently modifiable copy?  Yes or no.
>
> A.  No.
>
> Q.  Tell the jury why not.
>
> A.   There's nothing you can do with it.  It's just -- it looks like garbage.  It's just a bunch of random characters.  You can't modify it in any way.  You can't update your calendar using it.  It's just inaccessible in the form that a person could use it.

(Pistorino Decl. Ex. D at 85:15-86:3 (bracketed explanatory phrase added).)

Thus, because what is sent to the remote device is not a copy and is not stored on a global server, and because any intermediate copies transmitted through servers  between the LAN and the remote device are neither copies nor independently modifiable, the accused Seven products do not satisfy the "independently modifiable" limitation present in all asserted claims.  Seven is entitled to a judgment of noninfringement as a matter of law.[2]

---

[2]    Visto floated a number of other arguments to obscure the fact that the accused products do not satisfy the independently modifiable copy limitation.  These arguments are addressed in Sections III(B) and (C) below with respect to other claim limitations.

**B.**    **Seven Is Entitled To A Judgment Of Noninfringement As A Matter Of Law As To Claims 5 And 24 Of The '708 Patent, And Claims 11 And 22 Of The '192 Patent, Because The Undisputed Evidence Establishes That The Accused Products Do Not Satisfy The Limitations Requiring A Second "Workspace Element"**

Claims 5 and 24 of the '708 patent recite a limitation requiring "storing a second workspace element which is an independently modifiable copy of the first workspace element." (DX-1402.)  Claims 11 and 22 of the '192 patent require an "independently modifiable copy of the first workspace element."  (DX-1403.)  As explained above, because the accused Seven products do not contain independently modifiable copies of workspace elements, they do not satisfy this limitation.

To obscure and overcome that shortcoming of its case, Visto made several deceptive counter-arguments as to how the limitation requiring storage of a second "workspace element" that is an independently modifiable copy of a first workspace element is met by the accused products.  Visto's arguments, however, rely on claim constructions rejected by the Court.  Under a correct application of the Court's claim construction to the undisputed facts as adduced at trial, Seven is entitled to a judgment as a matter of law that the accused products do not satisfy the limitations requiring a "second workspace element" that is an independently modifiable copy of a first workspace element.

The Court defined a "workspace element" to mean "a subset of workspace data such as an e-mail, file, bookmark, calendar, or application program, *which may include version information.*"  (Dkt. Entry No. 145 (Court's April 20, 2005 Claim Construction Order) at 22 (emphasis added).)  Thus, the fact that each of the enumerated types of workspace elements may contain version information does not disqualify the combination of the element and its associated version information from being a workspace element.  In other words, the definition at a minimum requires the data types, and may optionally (and in addition to the data types) include version information.  But version information alone does not constitute a workspace element.  This construction makes sense, of course, because the entire purpose of the patents is to permit a

user using a remote device to access copies of workspace elements, such as e-mails or files, and to modify them independently of the copy stored at the user's corporate LAN.

Throughout trial, however, Visto advanced a twisted grammatical construction of "workspace elements" that nullified the Court's claim construction and ignored the purpose of the invention. Visto argued that version information, such as the flags and fonts indicating whether an e-mail has been read, *in isolation and divorced from the remainder of the workspace element* could constitute a copy of the first workspace element. This argument is not only directly opposed to the Court's construction of "workspace element," but it would also nullify the Court's construction of surrounding claim language in a manner rendering the surrounding language meaningless. *See*, *e.g.*, *Lucas Aerospace Ltd. v. Unison Indus., LP*, 890 F. Supp. 329, 332 (D. Del. 1995) ("A claim should not be construed in a manner that renders the claim language 'meaningless or superfluous.'" (*quoting Texas Instruments, Inc. v. United States Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1993)).

For example, when the "workspace element" limitations of the asserted claims are read *in the context of those claims*, the reader sees that the second "workspace element" must be an "independently modifiable copy" of the first workspace element. The Court expressly held that an "independently modifiable copy" must be an identical copy and rejected Visto's argument that the copy need not be an exact copy. (Dkt. Entry No. 145 (Court's April 20, 2005 Claim Construction Order) at 16-17.) Nevertheless, by reading "workspace element" in isolation from its surrounding claim language and by torturing the Court's construction of "workspace element," Visto circumvented these express holdings. Using this sleight of hand, Visto convinced the jury that a second workspace element that consisted only of isolated pieces of version information divorced from the e-mail or document with which they are associated – could be a "copy" of the entire first workspace element. This is, of course, nonsense because a read/unread flag is not a "copy" of an e-mail coupled with that flag. Such a result would render the claim language surrounding the second "workspace element" limitation, as well as portions of the Court's Claim Construction Order, entirely meaningless. It is a fundamental tenant of

patent law that claim terms must be construed in context with the surrounding claim language. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996); *see also ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003).

In addition, reading the Court's construction of "workspace element" so as to eviscerate the Court's construction of "independently modifiable copy" would defeat the entire purpose of the invention. Certainly, the propagation of mere telemetry messages, such as those indicating that a message was received or read, were well known, for example in the space program, long before the patents-in-suit were granted. Had the Patent Office been aware of the constructions that Visto advanced at trial, it is doubtful that the patents would have been granted.

### C. Seven Is Entitled To A Judgment Of Noninfringement As A Matter Of Law As To Claim 8 Of The '221 Patent, Because The Undisputed Evidence Establishes That The Accused Products Do Not Satisfy The "Global "Server" Limitation

The Court defined "global server" to mean "a server accessible from remote locations which stores independently modifiable copies of select portions of workspace data." As explained in Section III(A), *supra*, the accused products do not satisfy the global server limitation of claim 8 of the '221 patent for several reasons. First, Visto's expert, Dr. Head, conceded that the remote device does not function as the global server. (Pistorino Decl. Ex. C at 41:9-11.) The remote devices are not widely accessible, are not *servers*, and do not store "copies" of workspace elements. *See* §§ III(A) and (B), *supra*.

Second, none of the servers that assist in the transfer of information from the corporate LAN to the remote device can be "global servers" because they do not store "independently modifiable" copies of "workspace elements." What passes through these intermediate servers is neither modifiable nor a copy because it is transient, inaccessible, non-modifiable, and encrypted. *See* § III(A), *supra*. It is also not a "workspace element" when the Court's construction of that term is properly applied. *See* § III(B), *supra*. Accordingly, nothing in the systems of the accused products can properly be called a "global server."

Faced with these deficiencies in its case, Visto again tried a multi-level version of the same chicanery that it used with respect to the "workspace element" limitations. This time, Visto tries to apply the Court's constructions of "workspace data" and "workspace elements, as well as claim 8's recitation of "portions of workspace data" in a manner that would enable Visto to vitiate other claim limitations. The effort is no more successful here than it was with respect to "workspace element."

The Court construed "workspace data" as "data, *including corresponding* version information, which may include e-mail data, file data, calendar data, user data, etc. Workspace data may also include other types of data such as applications programs." (Dkt. Entry No. 145 (Court's April 20, 2005 Claim Construction Order) at 20 (emphasis added).) Thus, although the e-mail data, file data, or calendar data of interest may include version information, storing version information alone does not satisfy the workspace data definition. Any version information in workspace data must correspond to e-mail data, calendar data, file data, or other data that is also contained within the workspace data. Moreover, if only version information is stored as the second workspace element then what is stored at the global server (or second store) is not an independently modifiable *copy* of the first workspace element, because the first workspace element is the user data of interest *plus* its corresponding version information. Visto's tortured application of the Court's claim construction would vitiate surrounding claim limitations, such as that requiring an "independently modifiable copy" of what is on the first server. Because the first server stores the e-mail data, calendar data, and any other type of data which may include version information, so must the global server. In addition, Visto's application of the Court's construction would render the meaning of the patent claims wholly different than the invention described in the patents. The user's ability to modify *data* – and not simply corresponding version information – is the crux of the invention.

Visto further tries to avoid the plain meaning of the Court's construction by pointing to the phrase "of selected portions of workspace data" in claim 8 of the '221 patent or to the phrase "subset of workspace data" in the definition of workspace element. (Dkt. Entry No. 145 (Court's

April 20, 2005 Claim Construction Order) at 22.)  Visto argues that these phrases can refer to version information in isolation.  The phrases, however, refer to the subset of workspace elements (possibly with corresponding version information) in workspace data that are copied to the global server so that they can be accessed from a remote device.  In other words, a "portion of workspace data" means that some, but not necessarily all, of the workspace elements may be copied to the global server or second store.  Visto, however, wants the phrases to be re-construed as encompassing a portion of a *workspace element*, such as version information alone.  The Court, however, nowhere invited such a construction and, in fact, the Court's Claim Construction Order and the patent make perfectly clear what is meant by a "portion of workspace data."  The '221 patent and the Court's Claim Construction Order confirm that "the global server stores workspace data **163**, which includes an independently modifiable copy of *each selected workspace element* in the selected portions of workspace data."  (*Id.* at 23; *see also* '221 patent (DX-1405) at 6:23-26 (same).)  Because a correct application of the Court's construction of global server to the undisputed facts adduced at trial establishes that the accused products do not satisfy the global server limitation, Seven is entitled to judgment as a matter of law.

> **D.      Seven Is Entitled To A Judgment Of Noninfringement As A Matter Of Law As To Claim 11 Of The '192 Patent, Because The Undisputed Evidence Establishes That The Accused Products Do Not Satisfy The "Comprising One Of An HTTP Port And An SSL Port" Limitation**

Asserted claim 11 of the '192 patent contains a limitation requiring a "communications channel through a firewall comprising one of an HTTP port and an SSL port."  (DX-1802 at 4:33-34.)  In its Order dated April 18, 2006, the Court construed the phrase "HTTP port and SSL port" to mean "any port that is used to transfer information or communicate *using Hyper Text Transfer Protocol* (HTTP) and any port that is used to transfer information or communicate *using Secure Sockets Layer (SSL) protocol*."  (Dkt. Entry No. 340 (Court's April 18, 2006 Claim Construction Order) (emphasis added).)  This construction requires both the use of a port and the HTTP or SSL protocol.  The construction is consistent with what one of the named inventors, Daniel Méndez, testified was a point of novelty in the patents – disguising transfers of

information as ordinary internet traffic. In order to make the transfers appear like HTTP transfers or secure SSL transfers, the patented invention would have to use the ports *and protocols* typically used for such transfers. As Mr. Méndez explained:

> Q. Once the assistant is listening with one ear to the e-mail server and, for instance, notices there is a change to a calendar or an e-mail, what does the assistant, in your view, do next as you were conceiving of the idea?
>
> A. Well, what we would do then is something pretty radical. We would packet that information -- **package it in an envelope that was an HTTP** and go through the HTTP and SSL ports.

(Pistorino Decl. Ex. A at 92:5-13 (emphasis added).)

Thus, the alleged novelty of the invention was not simply using a port, such as port 80, that *could* be used for HTTP or SSL transfers, it was actually using the ports *and protocols* to package such transfers so that they would appear as typical HTTP or SSL transfers. Mr. Méndez further highlighted the use of the SSL *protocol* as a method for providing additional security. (*See id.* at 93:11-94:1.)

Thus, in order to get the benefit of additional security from the SSL protocol, one must use the secure SSL protocol and not just a port. Mr. Méndez acknowledged that the use of the HTTP and SSL protocols, as well as the ports, is necessary to the invention. (*Id.* at 95:19-96:2.)

In addition, the Court has already recognized the necessity of using the protocol as well as the port because it *rejected* Visto's proposed construction that the claim limitation refers only to the port. (*See*, *e.g.*, Dkt. Entry No. 331 (Visto's Supplemental Claim Construction Brief of Claim Terms From U.S. Patent No. 6,085,192) at p. 2.) Thus, there is no question that the Court's claim construction and the invention require the use both of HTTP or SSL protocols as well as specific ports.[3]

The reason that Visto was forced to ignore the Court's construction and stick with its previously rejected construction was because the undisputed evidence confirmed that none of the accused Seven products communicate or transfer information using the HTTP protocol or the

---

[3] A "port" is not a physical entity, but is simply "a number that appears in a message being sent" in a software command. (Pistorino Decl. Ex. D at 121:11-13.)

SSL protocol.  Visto's expert, Dr. Head, first testified as to the meaning of "protocol" and then confirmed that the Seven Enterprise Edition, Server Edition, and Personal Edition used custom Seven protocols rather than the well-known HTTP or SSL protocols:

> Q.  Okay.  Let's take the first part of your answer.  It is a standard Internet protocol.  What does that mean?  Does it mean that it is a particular way of communication?
>
> A.  A protocol is a defined term, sir.  Yes, it's a term of art.
>
> Q.  And what does it mean?
>
> A.  It means **the exact formatting, the syntax, and the semantics of the connection** that's being made.
>
> Q.  Formatting, syntax -- and what was the other one?
>
> A.  Of the connection that's being made.
>
> Q.  Of the connection.
>
> A.  And semantics, I think I added there.

(Pistorino Decl. Ex. C at 29:14-30:3 (emphasis added).)

> Q.  So when we talk about a protocol, it's a fairly specific way of communicating, isn't it?
>
> A.  It is a very specific way of communicating, yes, sir.
>
> Q.  Now, does the Server Edition use the formatting syntax, semantics, and connection of HTTP?
>
> A.  I don't believe so, sir.  But I believe it uses the port that is --
>
> Q.  Excuse me, sir.  My question was, does the **Server Edition** use what you have said is the formatting, syntax, and semant -- semantics of connection of **HTTP**; yes or no?
>
> MR. KATZ:  Your Honor, I object to his interrupting the witness' answer.
>
> THE COURT:  Overruled.
>
> Q.  (By Mr. Bunsow) Yes or no?
>
> **A.  No, sir**.
>
> Q.  Okay.  Does the **Personal Edition** use the formatting, syntax, and semantics of connection of **HTTP**?
>
> A.  I don't believe so, sir, **no**.

Q. Does the **Enterprise Edition** use the formatting, syntax, and semantics of connection of **HTTP**?

A. **No**, sir.

Q. Does the Personal Edition use the formatting, syntax, and semantics of connection of SSL?

A. I don't believe so, sir.

Q. Does the **Personal Edition** use the formatting, syntax, and semantics of connection of **SSL**?

A. I don't **believe so, sir**.

Q. Does the **Enterprise Edition** use the formatting, syntax, and semantics of connection of SSL?

A. **I don't believe so**, sir.

(*Id.* at 30:5-31:11 (emphasis added).)

Q. Okay. Let me -- I have a note here that I may have missed something. It's true, isn't it, that the Server Edition does not use the SSL formatting, syntax, and semantics of connection, correct?

A. They use the port that uses that, yes, sir.

Q. Answer my question, sir. Does the **Server Edition** of the product of SEVEN use the formatting, syntax, and semantics of connection of SSL?

A. It certainly does within the server complex.

Q. To go through the firewall? Does it use the SSL protocol to go through the firewall?

A. **I don't believe so. I believe they use their own secured encryption methods.**

(*Id.* at 54:13-55:2 (emphasis added).)

Dr. Head later clarified that the accused Seven products use a custom Seven protocol rather than the HTTP protocol, SSL protocol, or any other well-known protocol.

Q. Now, what protocol does SEVEN use over the SSL port?

A. **They use their own protocol**, which is -- they actually have more than one, but they use the -- SEVEN sync protocol.

(Pistorino Decl. Ex. G at 126:22-127:12 (emphasis added).)

Thus, because the undisputed evidence establishes that the accused products do not meet the limitation requiring a "communications channel through a firewall comprising one of an HTTP port and an SSL port" when that limitation is properly understood and applied, Seven is entitled to a judgment as a matter of law of noninfringement as to claim 11 of the '192 patent.

### E.    Seven Is Also Entitled To A Judgment Of Noninfringement As A Matter Of Law, Because Visto Failed To Establish That The Accused Products Satisfy The Synchronization Described In Claim 11 Of The '192 Patent

Asserted claim 11 of the '192 patent requires, *inter alia*, a synchronization-start module for operating within the first firewall.  During trial, Visto failed to establish that any of Seven's products had or performed the synchronization element necessary for infringement.  Visto's infringement expert, Dr. Head, agreed that Seven's products do not contain or perform the required synchronization element:

> Q.    Let me be clear, sir.
>
> A.    Yes.
>
> **Q.    This requires a synchronization start module for operating within the first firewall for initializing general synchronization module.  And for the SEVEN Enterprise Edition, there is no software within the firewall that does that?**
>
> A.    **There is no software on the SEVEN version that does that**, but the message that is sent to the Microsoft server configures it the way the SEVEN System wants it to be configured within the first 20 seconds of setup, sir.
>
> Q.    So is Microsoft accused in this case of infringement?
>
> A.    I don't believe so, sir.

(Pistorino Decl. Ex. C at 26:8-22.)

> Q.    Can you answer my question?  It's the Microsoft server that is doing  this synchronization.  The synchronization start module is in the Microsoft server, isn't it?
>
> A.    Yes.  My apologies.  I thought I was answering you.  Yes.

(*Id.* at 64:8-14.)

In addition to Dr. Head's material concessions at trial, Seven's infringement expert (Dr. Goldberg) also testified repeatedly that Seven's products did not satisfy the synchronization

required by the '192 patent. (Pistorino Decl. Ex. D at 130:15-132:4.) Visto failed to meet its burden that any of Seven's products performed synchronization in the manner required by claim 11 of the '192 patent. For this additional reason, a judgment of noninfringement as to claim 11 should be entered.

    **F.**    **Seven Is Also Entitled To A Judgment Of Noninfringement As A Matter Of Law, Because Visto Failed To Establish That The Accused Products Satisfy The Synchronization Elements Required By The '708 Patent**

Visto also had the burden at trial to show Seven's products utilized a "synchronization means," and that those products synchronized the "first workspace element and the second workspace element." (*See* DX-1402, claims 1 and 17.) Visto overwhelmingly failed to meet that burden. Instead, Visto relied exclusively on conclusory testimony from its expert, Dr. Head, as follows:

> Q.    All right. Moving to D, synchronization means for synchronizing the first workspace element and the second workspace element. Can you show us where that exists, if it does, on the SEVEN System?
>
> A.    Yes. This is a much more general version of the synchronization that we've seen before, and it involves all elements on both sides.
>
> Q.    And did you use your four methods to make that determination?
>
> A.    Yes, I did, sir.
>
> Q.    Did you compile a list of documents to support said analysis?
>
> A.    Yes, I did, sir.
>
> Q.    Is this that list?
>
> A.    Yes, it is, sir.
>
> Q.    Can we now check off that element?
>
> A.    That element is checked off.

(Pistorino Decl. Ex. C at 159:10-160:2.)

Importantly, Dr. Head never answered the question as to "where" the "synchronization means" exists on Seven's system. He presented no evidence that Seven's product does, in fact, have any such synchronization means as construed by this Court to include a detailed, multi-

leveled base system (illustrated in Fig. 4 of the '708 patent) and synchronization agent. (Dkt. Entry No. 145 (Court's April 20, 2005 Claim Construction Order) at 31.) Dr. Head never once referenced or specified any document demonstrating that Seven's product met the "synchronization" requirements. Indeed, no such document exists. Because there was no evidence that Seven's products met each and every limitation of asserted claims 5 and 24 of the '708 patent, the jury's finding as to infringement was improper. *Applied Medical*, 147 F.3d at 1376. A judgment of noninfringement as to claims 5 and 24 is required for this reason as well.

### G. Seven Is Also Entitled To A Judgment As A Matter Of Law Of Noninfringement, Given A Proper Construction Of The Claim Elements

Seven also requests judgment as a matter of law on the grounds that the under the proper construction of the claim elements, no evidence of infringement was offered.[4] With respect to each construction proposed by Seven but not adopted by the Court, there was no evidence presented from which the jury could properly have found infringement.

As just one example, the proper construction of "translator"/"translating" in the '708 patent requires a "global translator." During the prosecution of the '708 patent, the applicants argued this position to distinguish the prior art. At trial, however, Visto offered no evidence that a global translator was present in any of the accused products. Given a proper construction of the "global translator" phrase, and all other terms and phrases for which Seven's proposed construction was not adopted, there is no evidence of infringement. Accordingly, JMOL of noninfringement should be entered.

### H. Seven Is Also Entitled To A New Trial Under Rule 59(A) Because The Adverse Opinion Of Counsel Inference Prevented Seven From Receiving A Fair Trial

Seven is entitled to a new trial under Rule 59(a) of the Federal Rules of Civil Procedure, based on the prejudicial inference regarding Seven's opinion of counsel allowed at trial.

---

[4] Seven expressly preserves its right to appeal the Court's constructions of all claim terms construed in this case.

Seven opted to not waive its attorney-client privilege and work product immunity in this case, and did not rely upon the advice of counsel as a defense. Nevertheless, Visto strongly advocated an adverse inference regarding Seven's infringement opinion from counsel. Over Seven's repeated objections and motion *in limine*, Visto's counsel cross-examined Seven's witnesses on the opinion of counsel issue, and then argued during closing that the infringement opinion must be "bad" because Seven did not produce any opinion letter during trial:

> But the real test is, did they go out and hire independent lawyers to give them advice. And the testimony is, they did. But the rest of that is, you never saw their opinion, did you? They wouldn't bring it to you. They said they had one; Mr. Nguyen said they had one. I said, I can count on seeing that, can't I, and he said yes. You haven't seen it yet and won't see it, because they wouldn't show it to you. That by itself, Ladies and Gentlemen, is enough for you to find willfulness right there, because they wouldn't give and share with us and with you what their real independent outside lawyers told them.

(Pistorino Decl. Ex. H at 16:2-17:4.)

> Is it willful? You know, Mr. Bunsow wanted to say, well, gosh, I didn't want to bother you with a whole bunch of lawyers. Well, that was interesting, because he bothered to go get an opinion. His client sent out for opinions. They went and hired lawyers to give an opinion. Mr. Nguyen said you were going to see it, but he wouldn't drag it out of his briefcase. **He wouldn't show it to you, because it's bad, and he knows it's bad, or he would have shown it to you. And that's enough right there for willful infringement.**

(*Id.* at 53:9-20 (emphasis added).)

In finding infringement, and in particular, willful infringement, the jury unquestionably inferred that the Seven's legal infringement opinion was unfavorable. The adverse inference raised and urged by Visto's counsel was improper under the Federal Circuit's decision in *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004), and as explained in *McKesson Information Solutions, Inc. v. Bridge Medical, Inc*., WL 1030170, Slip Copy (E.D. Cal. 2006) (Pistorino Decl. Ex. J). The impropriety was compounded when the Court refused Seven's request to introduce its opinion of counsel letters *after* Visto improperly raised the issue with Seven's witnesses. The opinion issue was irrelevant and prejudicial, and should have been excluded pursuant to Seven's objections and motion *in limine*. Failing such exclusion, however, Seven should have at least been permitted to bring forth evidence and

introduce the opinion letter to rebut the impermissible adverse inference. Yet the Court rejected all of Seven's requests. Seven respectfully requests that the Court should grant a new trial, in that the prejudicial effect of the impermissible adverse inference tainted the entire case and destroyed Seven's ability to receive a fair trial.

### 1.   Seven Did Not "Open The Door" And Waive Its Attorney-Client And Work Product Privileges

During the cross-examination of Seven's infringement expert, Dr. Goldberg, Visto's counsel questioned Dr. Goldberg about the advice Seven received from counsel with respect to infringement. Over Seven's objections, the Court allowed Dr. Goldberg to answer those questions. Later, Visto's counsel cross-examined Bill Nguyen (Seven's co-founder) regarding whether Seven received any opinions from counsel. Again over Seven's objections, the Court allowed Mr. Nguyen to answer those questions regarding the *existence* of the attorney opinion letters. Neither Dr. Goldberg nor Mr. Nguyen was asked about any legal opinion letter during their respective direct examinations.

After the Court overruled Seven's objections and twice allowed Seven's witnesses to testify about the existence of attorney opinions, Seven moved *in limine* to preclude any further testimony regarding the opinion of counsel. Seven also requested that Visto's counsel be precluded from raising the issue during closing argument or otherwise arguing any adverse inference. Seven alternatively requested that it be allowed to introduce the legal infringement opinions in order to rebut the adverse inference raised by Visto. The Court summarily rejected all of Seven's requests, ruling that Seven "opened the door" with Dr. Goldberg as to the opinion of counsel issue. (Pistorino Decl. Ex. F at 4:13-5:7.)

Dr. Goldberg is not a lawyer. Dr. Goldberg is Seven's technical infringement expert. He was hired shortly after Seven was sued. His opinions were based on **his own** investigation of Seven's products and **his own** examination of the patents. His opinions were expressed in declarations and expert reports that were filed or produced in the case without implicating any privilege waiver. He did not rely on any opinion from any attorney in forming his own opinions.

On direct examination, Dr. Goldberg explicitly stated that he *was not* a lawyer and testified about his own technical opinions. (Pistorino Decl. Ex. E at 138:19-140:23.)

Seven did not "open the door" and waive the attorney/client and work product privileges associated with its opinion of counsel through Dr. Goldberg's testimony, because that content of that testimony was already disclosed in the case and did not reflect privileged communications. What Dr. Goldberg did or did not do and what he said or did not say was fully discoverable in this case and NOT subject to the attorney client privilege. The opinion of counsel issue was *never raised* during Dr. Goldberg's direct examination. Dr. Goldberg testified as to **his own technical (not legal)** expert opinions regarding infringement. While Dr. Goldberg's testimony may go to the "totality of the circumstances" test for willful infringement mandated by the Federal Circuit, Dr. Goldberg's opinions simply cannot "open the door" to the advice of counsel issue and eviscerate all privileges associated therewith. *Knorr-Bremse*, 383 F.3d at 1347; *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc*., 862 F.2d 1564 (Fed. Cir. 1988) ("totality of the circumstances" test). Dr. Goldberg's opinions are separate and apart from Seven's opinion of counsel, but Dr. Goldberg's opinions were also relied upon by Seven in assessing Visto's case. Neither Dr. Goldberg nor Seven has ever relied upon any opinion of counsel as a defense. While Visto was free to cross-examine Dr. Goldberg regarding his own opinions as to infringement, the cross-examination and testimony as to opinions of counsel were irrelevant, and should have been precluded.

> **2.  The Federal Circuit's Decision In *Knorr-Bremse* Prohibits The Adverse Inference Raised By Visto**

Under the recent decision of *Knorr-Bremse*, allowing the adverse inference Visto created during trial was improper. In *Knorr-Bremse*, the Federal Circuit overruled contrary precedent and held that "no adverse inference that an opinion of counsel was or would have been unfavorable flows from an alleged infringer's failure to obtain or produce an exculpatory opinion of counsel." *Knorr-Bremse*, 383 F.3d at 1341.

Recently, the Eastern District of California in *McKesson* recognized the *Knorr-Bremse* holding, granting a motion *in limine* precluding – in all respects – plaintiff from introducing evidence or testimony pertaining to defendant's assertion of the attorney-client privilege over the opinion of counsel it received regarding the patent at issue. The court reasoned:

> While the court acknowledges that [plaintiff] may well be prejudiced in proving its case of willful infringement by preclusion of evidence that [defendant] obtained an opinion of counsel and asserts the attorney-client privilege, the court must also consider that [defendant] would be prejudiced by the admission of such evidence.
>
> …
>
> Were the court to permit such evidence, even with a cautionary instruction imposing *Knorr's* limitations (of no adverse inference), the jury would nevertheless be left to speculate as to why [defendant] would not reveal its counsel's opinion. **It is inescapable that the jury would likely conclude that [defendant] received an unfavorable opinion, otherwise [defendant] would reveal it. This is precisely the negative inference *Knorr* prohibits.**

*McKesson*, WL 1030170 at *2 (emphasis added).

*McKesson* is directly on point here, and correctly applies the Federal Circuit's mandate in *Knorr-Bremse*. As in *McKesson*, Visto's attempt to draw an adverse inference ran directly afoul of *Knorr-Bremse*. Allowing the impermissible testimony and argument regarding the advice of counsel encouraged *precisely* the adverse inference *Knorr-Bremse* explicitly prohibits. The Court should have precluded further testimony or argument relating to Seven's opinion of counsel. Under the Federal Circuit's holding in *Knorr-Bremse*, Seven is entitled to a new trial based on the improper and unfair prejudice engendered by Visto's cross-examination and closing arguments.

### 3. Seven Was Further Prejudiced Because The Court Denied Seven's Request To Defend Itself From The Impermissible Adverse Inference

A new trial is warranted for an additional reason. During trial, Seven alternatively requested that it be permitted to introduce its opinion letters and rebut the impermissible adverse inference established by Visto. The Court denied Seven's alternative request as well:

> THE COURT: Well, both motions are denied, Counselor. Your witnesses are the ones that inserted this into the record. The fact that you stipulated early on in this case that you were not going to rely on an opinion of counsel which precluded the

other side from seeking discovery, the fact is, your witness is the one -- when asked what he relied on, he was the one that testified we are relying in part on opinion of counsel or words to that exact effect.

Additionally, you introduced into the record in this case the fact that y'all sought the opinions of a scientist and relied on them instead of -- that that report was given to counsel. You opened this door wide open, and you're not now going to be allowed to back off of your stipulation that you're not going to bring in the opinions of counsel.

(Pistorino Decl. Ex. F at 3:16-4:7.)

In rejecting Seven's request, the Court denied Seven any opportunity to overcome the impermissible testimony and argument related to its opinion of counsel. As discussed above, no Seven witnesses testified on direct examination that they were relying upon any opinion of counsel. All testimony related to opinion of counsel was elicited on cross-examination *over Seven's objections*. The opinion testimony should have been excluded in the first instance. However, allowing Visto to argue that the opinion letters were "bad" and then rejecting Seven's attempt to show the opinion letters said otherwise was inherently unfair and prejudicial. This constitutes an additional ground under which the Court should grant Seven a new trial.

### 4. Seven Is Also Entitled To JMOL Because The Questions And Argument Regarding Seven's Opinions Of Counsel Should Have Been Excluded Under Federal Rules Of Evidence 402 And 403

The testimony and argument relating to Seven's opinion of counsel should also have been excluded because it is irrelevant and highly prejudicial under Rules 402 and 403 of the Federal Rules of Evidence. By allowing Visto to solicit testimony regarding opinion of counsel, and to allow argument during closing argument that the opinion letter provided to Seven was "… bad, and [Seven's counsel] knows it's bad, or he would have shown it to you" was erroneous. (*See* Pistorino Ex. H at 53:18-19.)

There is simply no possibility that Seven could receive a fair trial after the Court (1) allowed Visto's counsel to impermissibly elicit irrelevant opinion of counsel testimony with Seven's witnesses, (2) allowed Visto's counsel to argue that the opinion letter was "bad," and then (3) summarily rejected Seven's request to demonstrate that the opinion letter showed otherwise. The Court failed to properly apply the Federal Circuit's holding in *Knorr-Bremse* and

Federal Rules of Evidence 402 and 403, thereby unfairly prejudicing Seven and its ability to receive a fair trial.  Seven is thus entitled to a new trial under Rule 59(a).[5]

## I.     Seven Is Entitled To A New Trial Regarding Its '192 Invalidity Claim

Seven also requests a new trial on the '192 invalidity issues pursuant to Rule 59(a) of the Federal Rules of Civil Procedure.  The '192 reexamination claims issued well after the discovery cut-off date in this case.  As a result, Seven requested that the Court re-open discovery as to the new '192 claims in order to fully prepare its '192 invalidity case.  Alternatively, Seven requested that the Court preclude Visto from asserting the new '192 claims at trial.  The Court denied both of Seven's requests.  Next, the Court struck all portions of Seven's expert reports relating to the new '192 claims.  Finally, the Court disallowed all evidence of prior art relating to those claims at trial.  The Court flatly rejected all of Seven's attempts to assert any '192 invalidity defense as to the new claims.  Because the Court's rulings were inherently prejudicial to Seven, a new trial is warranted for this additional reason.

### 1.     A New Trial Is Warranted Because The Court Denied Discovery On The Newly Issued '192 Patent Claims

After the close of discovery in this action, the Court entered a stay in the proceedings. While that stay was in effect, the U.S. Patent & Trademark Office finalized reexamination proceedings related to the '192 patent.  The '192 reexamination certificate issued on November 22, 2005.  During the reexamination, Visto amended virtually every claim of the '192 patent. The amended claims included many new limitations to overcome the prior art identified by Seven during discovery.

During the discovery period, claims with the new, reexamined limitations did not exist. Visto never identified claims containing the new limitations in its disclosure of asserted claims. The new limitations were never discussed in Visto's expert reports.  Because the new claims

---

[5]    If the Court refuses Seven's request for a new trial, it should, at the very least, enter Judgment as a Matter of Law and find no willful infringement.  For all of the reasons presented above, the admissible evidence here is wholly insufficient to support a finding of willfulness.

issued *after* the close of discovery, Seven had no opportunity to take discovery related to the new claims. In fact, the Court's stay order expressly precluded Seven from doing so. Seven therefore moved to re-open discovery for a two-month period, in order to conduct discovery related to the new, reexamined claims.

In its moving papers, Seven asserted that it had identified prior art anticipating the newly amended claims of the '192 patent. In order to adequately prepare a defense to the new claims based on this prior art, Seven requested an opportunity to take related third-party discovery. In the alternative, Seven argued that Visto should be precluded from asserting the new '192 claims at trial. The Court rejected Seven's request for further discovery, ruling that "[f]act discovery is closed." (Dkt. Entry No. 282 (Court's February 9, 2006 Order) at 1.) The Court then permitted Visto to assert the new '192 claims at trial without any discovery.

Where the discovery sought is already available, or could have been obtained with reasonable care during the time allotted by the court, the denial of further discovery is not prejudicial. *See, e.g.*, *Rosario v. Livaditis*, 963 F.2d 1013, 1019 (7th Cir. 1992), *cert. denied*, 113 S. Ct. 972 (1993) (party who fails to pursue discovery in the face of court ordered cutoff cannot plead prejudice from his own inaction). Or again, where the information sought will have no effect on the outcome of the case or is simply irrelevant to the issues presented, the denial of discovery is not prejudicial. *See*, *e.g.*, *Brown-Bey v. United States*, 720 F.2d 467, 471 (7th Cir. 1983).

The situation present in *Rosario* and *Brown-Bey* is absolutely not the situation here. Seven had no opportunity whatsoever to conduct discovery on the reexamined claims. *Some* process was plainly due, and Seven *plainly had none*. Indeed, the Patent Office issued the reexamined claims *after* the discovery cut-off date. Discovery on the reexamined claims would have uncovered substantial issues relating to invalidity. Invalidity is, of course, a centrally relevant issue in any patent infringement case. Allowing Visto to assert the reexamined claims without granting Seven's motion for further discovery on those claims was erroneous and deprived Seven of due process. Specifically, Visto's main focus throughout trial related to the

"smart phone" element of the reexamined claims. Seven was denied all opportunity for any discovery on that element. The Court's ruling unfairly prejudiced Seven and its ability to assert its invalidity claims at trial, and unfairly prejudiced Seven's ability to defend itself. Accordingly, a new trial should be granted. *See Williamson v. United States Dept. of Agriculture*, 815 F.2d 368, 373 (5th Cir. 1987); *see also Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 548 (5th Cir. 1980), *cert. denied*, 454 U.S. 927 (1981), *abrogated on other grounds*, *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438 (11th Cir. 1991) (If discovery could uncover one or more substantial fact issues, the appellant should be entitled to reasonable time to do so.).

> **2.      A New Trial Is Warranted Because The Court Erroneously Struck Seven's Expert Reports And Disallowed Evidence Regarding The Newly-Issued '192 Patent Claims**

Not only did the Court unfairly prejudice Seven be refusing to re-open discovery as to the new claims, but the prejudice was compounded when all portions of Seven's expert reports relating to those claims were stricken. In granting Visto's motion to strike, the Court ruled as follows:

> To the extent that Seven's new expert reports rely on prior art that was not previously in an expert report nor part of Seven's invalidity Contentions, the Court grants Visto's Motion to Strike.

(Dkt. Entry No. 316 (Court's March 27, 2006 Order) at 2.)

The prior art identified in Seven's expert reports relating to the '192 reexamination claims could not possibly have been in a "previous expert report" or part of Seven's invalidity contentions. The reason is simple: the '192 reexamination claims *did not exist* at the time Seven's original expert reports or invalidity contentions were served. Seven had no reason to include prior art relating to claims which did not exist. Instead, Seven presented the prior art and sought additional information promptly *after* the reexamination claims issued. While knowledge of this prior art may have been obtained after the close of discovery, the information relating to and describing the prior art should not have been stricken from the expert reports. *Los Angeles News Serv. v. CBS Broad., Inc.*, 305 F.3d 924, 933 (9th Cir. 2002), *amended at Los Angeles*

*News Serv. v. CBS Broad., Inc.*, 313 F.3d 1093 (9th Cir. 2002) (information obtained after the discovery "cut-off" date may nonetheless be admissible at trial). The Court's decision to strike the expert references and disallow evidence at trial relating to the prior art further prejudiced Seven's ability to receive a fair trial. For this additional reason, the Court should grant a new trial on the '192 invalidity issue.

### J. Judgment As A Matter Of Law Is Appropriate Because There Is No Evidence Supporting A 19.75 Percent Royalty Rate

A patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. The statute contemplates that when a patentee is unable to prove entitlement to lost profits or an established royalty rate, it is entitled to "reasonable royalty" damages based upon a hypothetical negotiation between the patentee and the infringer when the infringement began. *See Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983) (describing the hypothetical negotiation as one "resulting from arm's length negotiations between a willing licensor and a willing licensee"). Although this analysis necessarily involves an element of approximation and uncertainty, a trier of fact must have some factual basis for a determination of a reasonable royalty. *Unisplay, S.A. v. American Elec. Sign Co.*, 69 F.3d 512 (Fed. Cir. 1995). Any rate determined by the trier of fact must be supported by relevant evidence in the record. *Id.*

The determination of the amount of damages based on a reasonable royalty is an issue of fact. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1164 (Fed. Cir. 1991). When a party files a motion to amend the judgment or, in the alternative, to grant a new trial on the amount of damages awarded by a jury, "the trial court determines whether the jury's verdict is against the clear or great weight of the evidence." *See Standard Havens Prods. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1367 (Fed. Cir. 1991), *cert. denied*, 113 S. Ct. 60 (1992). The district court has wide discretion in determining whether to grant a new trial under this standard. *Unisplay*, 69 F.3d at 512.

The great weight of evidence here indicates that the appropriate royalty should have been three percent. Instead, the jury awarded a 19.75 percent royalty rate, corresponding to a damage award of $3,683,000. Visto failed to offer any admissible evidence in support of the 19.75 percent rate. Indeed, it is undisputed here that Visto negotiated and agreed to a *three percent* royalty rate to license wireless email technology from its competitor, NTP, Inc. (*See*, *e.g.*, Pistorino Decl. Ex. A at 15:21-18:5.) Visto's co-founder, Mr. Méndez, testified at trial that the NTP technology was fundamental to Visto's wireless email products. (Pistorino Decl. Ex. B at 17:25-18:5.) Accordingly, the NTP royalty figure was the relevant benchmark from which the jury should have established any reasonable royalty. *Unisplay*, 69 F.3d at 519 (Evidence as to other negotiated royalty rates "… should carry considerable weight in calculating a reasonable royalty rate."). There was no evidence supporting the jury's exponential increase of the royalty rate from the established three percent NTP rate. The jury's award of a 19.75 percent royalty rate goes against the clear weight of the evidence. Accordingly, judgment as a matter of law is appropriate. *Id.*; *Standard Havens*, 953 F.2d at 1370. If any damage award is entered, the Court must award no more than a three percent royalty rate.

### K. Seven Is Entitled To Judgment As A Matter Of Law As To Invalidity Of The '708 Patent

During trial, Seven presented Timothy Halvorsen as an expert on Lotus Notes. Mr. Halvorsen was one of the original co-founders and developers of Lotus Notes. (Pistorino Decl. Ex. E at 111:23-25.) He testified extensively about his development and use of Lotus Notes beginning in the mid-1980s. For example, he testified that Lotus Notes performed translation in the same manner taught in claims 5 and 24 of the '708 patent. (*Id.* at 169:24-170:7.) Mr. Halvorsen testified that Lotus Notes uses a "first and second store" as does claims 5 and 24 of the '708 patent. (Pistorino Decl. Ex. F at 26:2-27:22.) He spoke at length about Lotus Notes' "communications channel" connecting the first and second stores (*id.* at 27:23-28:11); the "synchronization means" present in Louts Notes (*id.* at 28:12-33:14); and a "translator" used to translate between the first and second format in Lotus Notes (*id.* at 33:15-34:18). Finally, Mr.

Halvorsen confirmed that Lotus Notes used a firewall as contemplated in claim 5 of the '708 patent. (*Id.* at 34:19-35:24.) Mr. Halvorsen confirmed that Lotus Notes, in fact, performed each and every element present in claim 5 of the '708 patent.

As to claim 24 of the '708 patent, Mr. Halvorsen testified that Lotus Notes accessed a first store, and stored a "workspace element" in the first format. (*Id.* at 36:10-37:4.) Further, Lotus Notes accessed a "second store," storing a second "workspace element", which is an "independently modifiable copy" of the "first store." (*Id.* at 37:5-23.) He confirmed that the synchronization method used by Lotus Notes was the same as contemplated in claim 24 of the '708 patent. (*Id.* at 37:24-38:15.) Mr. Halvorsen went through each element of independent claim 17 and dependent claim 23 (from which claim 24 depends), and confirmed Lotus Notes performed each and every element of those claims. (*Id.* at 41:5-16.)

Despite Mr. Halvorsen's exhaustive review of Lotus Notes vis-à-vis claims 1, 5, 17, 23, and 24 of the '708 patent, Visto's counsel *never once* cross-examined Mr. Halvorsen on *any* claim or claim element present in the '708 patent. The '708 patent and/or its claims were never even mentioned during Mr. Halvorsen's cross-examination. Moreover, Visto failed to provide *any* witness or other evidence to rebut Mr. Halvorsen's testimony that Lotus Notes performed each and every element in the '708 asserted claims. Mr. Halvorsen's testimony constituted clear, convincing, and *uncontroverted* evidence that Lotus Notes anticipated claims 5 and 24 of the '708 patent. In fact, Visto's *own expert witness* on Lotus Notes, Steven Beckhardt, confirmed that Lotus Notes anticipated many aspects of the '708 patent as follows:

> QUESTION: So if the Court's claim construction was correct, would you agree that Lotus Notes included this element of a firewall?
>
> ANSWER: Yes.

(Pistorino Decl. Ex. G at 8:3-6.)

> QUESTION: If the Court's construing synchronization start module to be any software routine that instructs the general synchronization module to begin synchronization process, am I correct that Lotus Notes had a software module that instructed software to begin synchronization?
>
> ANSWER: Yes.

(*Id.* at 29:11-17.)

> QUESTION:  Okay.  So is it your understanding and your opinion that under the Court's claim construction of firewall and synchronization start module, that Lotus Notes anticipates the claims -- the asserted claims of this patent?
>
> ANSWER:  Just to be sure, does the word anticipates mean does the technology does the thing at an earlier time?
>
> QUESTION:  Yes.
>
> ANSWER:  Yes, then it does.

(*Id.* at 31:7-16.)

Judgment as a matter of law is proper where, as here, "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."  FED. R. CIV. P. 50(a)(1).  Because no reasonable jury could have reached its verdict in light of Mr. Halvorsen's and Mr. Beckhardt's undisputed testimony, the Court must enter judgment on the '708 invalidity issue in favor of Seven.  *Applied Medical*, 147 F.3d at 1376.

### L.    Seven Is Entitled To Judgment As A Matter Of Law As To Invalidity Of The '221 Patent

Mr. Halvorsen and two other Seven witnesses also testified extensively about their development and use of Lotus Notes pre-dating the '221 patent.  Seven presented testimony and other evidence through all three Lotus witnesses that each and every asserted claim element in the '221 patent was anticipated by Lotus Notes.  (*See generally* Pistorino Decl. Ex. G at 41:17-47:17.)  Visto failed to present any witness rebutting this testimony.  In fact, as with the '708 patent, Visto's expert witness on Lotus Notes agreed with Mr. Halvorsen, and testified that Lotus Notes anticipated the '221 patent as well.  (*See*, *e.g.*, *id.* at 37:8-38:6; 39:10-39:23 [*Question*: "… I take it it's your opinion that all of the asserted claims of the '221 patent, given the construction for provide by the Court describes what Lotus Notes did?  *Answer*:  Within the claims of the Court's construction order, yes."].)

Based on the uncontroverted testimony from Seven's and Visto's expert witnesses, judgment as a matter of law as to invalidity of the '221 patent is proper.

**M.      Seven Is Entitled To Judgment As A Matter Of Law As To Invalidity Of The '192 Patent, Because The Use Of A Modem And Headset With Lotus Notes Constitutes A "Smartphone"**

With respect to the '192 patent, Visto cross-examined Mr. Halvorsen extensively on the "smartphone" element present in claim 10 (from which asserted claim 11 depends) and claim 22. Mr. Halvorsen testified that the use of a modem and headset with Lotus Notes constituted a "smartphone" under the Court's construction of that term.  (Pistorino Decl. Ex. F at 53:4-54:22; 61:2-62:25.)  In other words, Mr. Halvorsen established that the use of a modem and headset with Lotus Notes constitutes a "telephone device that integrates computing capabilities and telephone capabilities."  (*Id.* at 53:4-54:22.)  Visto failed to prevent any testimony from any witness disputing that Lotus Notes utilized and incorporated a smart phone as construed by the Court.   Seven is therefore entitled to a ruling that the use of a modem with Lotus Notes constitutes a smart phone, *i.e.*, a "telephone device that integrates computing capabilities and telephone capabilities."  Given such a ruling, judgment as a matter of law is appropriate as to invalidity of the '221 and '192 patents.  No reasonable jury could have reached a different verdict in view of the evidence.  *Applied Medical*, 147 F.3d at 1376.

**N.      Seven Is Entitled To Judgment As A Matter Of Law As To All Patents And Claims Not Asserted At Trial**

As the outset of this case, Visto asserted six patents against Seven, claiming infringement of 199 claims.  (*See* Pistorino Decl. Ex. K at 1.)  Before trial, Visto elected to drop all of its claims, except for claims 5 and 24 of the '708 patent, claims 11 and 22 of the '221 patent, and claim 8 of the '221 patent.  Visto also unconditionally agreed to not assert the dropped claims against Seven in the future.  (*See* Pistorino Decl. Ex. I.)

Because Visto did not present any evidence of its dropped patents and claims at trial, it necessarily did not meet its burden in proving infringement of those patents and claims.  *Bruff*,

244 F.3d at 495.  Accordingly, judgment as a matter of law is appropriate as to all Visto patents and claims originally asserted in this action, for which no evidence was presented at trial.

## IV.    CONCLUSION

For the foregoing reasons, this Court should grant judgment as a matter of law that the '708, '221, and '192 patents are not infringed and are invalid.   In the alternative, Seven respectfully requests that the Court grant a new trial under Rule 59(a) of the Federal Rules of Civil Procedure.  The Court should also grant judgment as a matter of law as to the patents and claims Visto did not assert at trial.

Dated:  June 2, 2006                            By: ____/s/ Henry C. Bunsow with permission James C. Pistorino

Henry C. Bunsow
*Lead Attorney*
California State Bar No. 60707
K.T. Cherian
California State Bar No. 133967
James F. Valentine
California State Bar No. 149269
James C. Pistorino
Texas State Bar No. 00797828
California State Bar No. 226496
HOWREY LLP
525 Market Street, Suite 3600
San Francisco, CA  94105
Telephone:  415/848-4900
Facsimile:  415/848-4999
E-mail:  BunsowH@howrey.com
E-mail:  CherianK@howrey.com
E-mail:  ValentineJ@howrey.com
E-mail:  PistorinoJ@howrey.com

S. Calvin Capshaw
Texas State Bar No. 03783900
BROWN MCCARROLL, LLP
1127 Judson Road, Suite 220
Longview, TX  75601-5157
Telephone:  903/236-9800
Facsimile:   903/236-8787
E-mail:  ccapshaw@mailbmc.com

Attorneys for Defendant
SEVEN NETWORKS, INC.

## <u>CERTIFICATE OF SERVICE</u>

A true and correct copy of the above and foregoing document was served on the

following counsel as follows on this 2nd day of June, 2006.


_____
/s/ James C. Pistorino
JAMES C. PISTORINO

Samuel F. Baxter, Esq.
MCKOOL SMITH, PC
505 East Travis Street, Suite 105
Marshall, TX  75670
(*Via CM/ECF*)

Ronald S. Katz, Esq.
Robert D. Becker, Esq.
Shawn G. Hansen, Esq.
MANATT, PHELPS & PHILLIPS, LLP
1001 Page Mill Road, Building 2
Palo Alto, CA  94304
(*Via CM/ECF*)

*Attorneys for Plaintiff Visto Corporation*